**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CLOVERLAND-GREEN SPRING** | : | |
| **DAIRIES, INC.,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 1:CV-99-487** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **PENNSYLVANIA MILK** | : | |
| **MARKETING BOARD, et al.,** | : | |
| **Defendants** | : | |

**ORDER AND JUDGMENT**

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Cloverland-Green Spring Dairies, Inc. ("Cloverland") filed the instant Complaint on March 29,

1999, challenging minimum wholesale and minimum retail prices set by the Pennsylvania Milk

Marketing Board ("Board") by the authority of the Pennsylvania Milk Marketing Law.  The Court

granted motions to intervene filed by the Pennsylvania Association of Milk Dealers ("PAMD") as a

proposed defendant on April 7, 1999, and by the Milk Consumers, as proposed plaintiffs on May 13,

1999.[1]  On February 2, 2001, this Court, per Judge Rambo, granted summary judgment for

Defendants, see Cloverland v. Pa. Milk Mktg. Bd., 138 F. Supp 2d 593 (M.D. Pa. 2001), rejecting

Plaintiffs challenge to the minimum wholesale and retail prices as violative of the Commerce Clause of

the United States Constitution.  Using the balancing test enunciated in Pike v. Bruce Church, Inc., 397

U.S. 137 (1970) ("Pike"), the Court found that the wholesale price floor in controversy advanced the

legitimate local benefit of averting a milk shortage and only incidently burdened interstate commerce.

---

[1] Plaintiff-Intervenors were Pennsylvania milk consumers residing in Pennsylvania Milk Marketing Area 4, Sue A. Spigler and Gertrude Giorgini, and in Pennsylvania Milk Marketing Area 1, Thomas E. McGlinchey.  None of the Plaintiff-Intervenors participated during trial.

Cloverland, 138 F. Supp. 2d at 610-12.  Similarly, the Court found that the retail price floors do not

affect out of-state interests in any way.  Id. at 612.

The United States Court of Appeals for the Third Circuit, reversed in part and affirmed in part

the Court's decision.  See Cloverland v. Pa. Milk Mktg. Bd., 298 F.3d 201 (3d Cir. 2002).  The

Court affirmed Judge Rambo's order for summary judgment with respect to the minimum retail price

regulation, finding no evidence that the regulation burdens interstate commerce.  Id.  The Third Circuit

reversed the order for summary judgment on wholesale prices, finding that genuine issues of material

fact existed with respect to whether Pennsylvania's minimum wholesale milk price floor violated the

dormant commerce clause of the United States Constitution.  Cloverland, 298 at 219.  The Court held

that the record, viewed in a light favorable to non-moving Plaintiff, supported findings that could trigger

heightened scrutiny, a standard the wholesale regulations could not satisfy.  Id. at 215.  Moreover, the

Court found that the record supported finding the regulated wholesale milk prices failed the even less

stringent Pike balancing test.  Id. at 218.

On remand, Cloverland challenges the Pennsylvania Milk Marketing Law and two orders

issued pursuant thereto (Orders A-890A and A-900) (hereafter collectively referred to as the "Milk

Law") to the extent they set minimum wholesale prices for portions of the state designated as Areas 1

and 4.  During a six-day bench trial held in October and December of 2003, the Court received

evidence related to the constitutionality of Pennsylvania's wholesale milk price regulations, consolidating

Cloverland's request for injunctive relief with the trial on the merits pursuant to FED. R. CIV. P.

65(a)(2).  Upon consideration of all evidence and arguments presented, the Court makes the following

findings of fact.

2

I.    <u>Findings of Fact</u>

The Pennsylvania milk industry is subject to complex federal and state economic regulations that govern prices from farm to table by regulating producers, processors, and retailers.  Since 1937, the Agricultural Marketing Agreement Act, 50 Stat. 246, as amended, 7 U.S.C. § 601 <u>et</u> <u>seq.</u>, has authorized the United States Secretary of Agriculture to regulate, <u>inter</u> <u>alia</u>, the minimum prices paid to producers of raw milk by issuing marketing orders for particular geographic areas.  The Northeast Federal Milk Marketing Order area consists of Vermont, New Hampshire, Connecticut, Massachusetts, New Jersey, Rhode Island, Delaware, Maryland, and portions of Pennsylvania and New York.  (Doc. No. 69.)  The Federal Order System favors the movement of raw milk east and south throughout the northeastern United States, drawing the supply away from the rural northwest counties of Pennsylvania and New York and towards the cities of New York, Washington D.C., and Philadelphia.  (R. 735.)[2]  The Secretary of Agriculture promotes this objective by mandating slightly higher minimum Class 1 prices for raw milk in the southeastern portions of the Northeast Federal Marketing Area.  (<u>Id.</u>)  Because of this price differential, processors are more likely to buy milk from producers in the northwestern portion of the region, drawing the milk supply southeast.  (<u>Id.</u>)

Layered onto this pricing scheme is the Pennsylvania Milk Marketing Law ("Milk Law").  31 PA. CONS. STAT. ANN. § 700j-101, <u>et</u> <u>seq</u>. (West 2004).  The Milk Law provides, <u>inter</u> <u>alia</u>, for the creation of a Milk Marketing Board, an instrumentality of the Commonwealth with the power to:

> supervise, investigate and regulate the entire milk industry of this
> Commonwealth, including the production, transportation, disposal,

―――――――――――――――――

[2]  For brevity, the trial transcript will be referred to as "R.", followed by the page number.

3

> manufacture, processing, storage, distribution, delivery, handling, bailment,
> brokerage, consignment, purchase and sale of milk and milk products in this
> Commonwealth, and including the establishment of reasonable trade practices,
> systems of production control and marketing area committees in connection
> therewith . . . .

31 PA. CONS. STAT. ANN. § 700j-301.  The Board describes the Milk Law as a "three legged stool,"

each leg of which represents a different layer of price control: the producer price, the wholesale price,

and the retail price.

The Board regulates the price of raw milk by setting an "over-order premium" over and above

the federally mandated minimum price.  Id.  (Doc. No. 234, ¶ 32.)  Only milk that is purchased from

Pennsylvania producers, processed in Pennsylvania, and sold as Class 1 milk within Pennsylvania is

subject to this over-order premium.[3]  (R. 46.)  The Board adjusts this premium at least twice yearly to

ensure that diary farmers' income remains constant in the face of droughts and fluctuating fuel and

production costs.  Absent the over-order premium, Pennsylvania small dairy farmers would not be

viable.

The Board also regulates milk prices by designating six separate milk marketing territories,

denominated as "Area" (e.g., Area 1, Area 4).  The Board periodically sets minimum wholesale price

floors for the sale of milk in each area.  31 PA. CONS. STAT. ANN. § 700j-801.  To establish these

price floors, the Board conducts hearings in which it examines, inter alia, the production costs of a

representational cross section of milk dealers within each specific marketing area.  (R. 559.)  The

---

[3] "Raw milk used to produce fluid milk products has the highest price and is characterized in the federal order as 'Class [1]' milk.  Milk used for other products, such as eggnog, sour cream, and hard cheese, bears a lower price and is characterized as 'Class [2]' and 'Class [3]' milk."  W. Lynn Creamery v. Healy, 512 U.S. 186, 190 n.1 (1994).

4

Board then audits these dealers to find the average costs for raw milk, containers, and delivery of milk within the marketing area. (R. 555-85.) The Board sets a mandatory minimum wholesale price for each marketing area by adding a 2 ½ to 3 ½ percentage mark-up to the average costs within each area. (R. 587-88.)

Finally, the Board regulates the retail sale of milk by establishing minimum retail prices below which milk may not be sold. Any processor or retailer who attempts to sell milk below the minimum price set within the area is subject to fines, suspension of its license, and imprisonment of no more than one year. 31 PA. CONS. STAT. ANN. §§ 700j-404, 700j-1002.

Plaintiff Cloverland is a Baltimore-based Maryland corporation engaged in the business of processing and selling milk products. (Doc. No. 234, ¶ 1.) Cloverland is a licensed Pennsylvania milk dealer in Pennsylvania. (Id.) Defendants are the three members of the Board and the Defendant-Intervenor, the Pennsylvania Association of Milk Dealers (collectively, "Defendants"). (Id., ¶ 3-4.) The Pennsylvania Association of Milk dealers is a trade association of Pennsylvania milk processors. (Id., ¶ 4.)

Cloverland purchases thirty-five percent (35%) of its raw milk from milk cooperatives. (R. 47.) Milk cooperatives are agricultural associations of producers organized in order to collectively sell their milk to processors, as defined by the Capper-Volstead Act, 7 U.S.C. § 291 (2004). This collective negotiating allows cooperatives to charge a higher price for their raw milk. In fact, cooperatives charge prices, above the federal minimum, equal to the Pennsylvania over-order premiums. (R. 47- 49.) Because these premiums are negotiated between the cooperatives and the processor, they apply regardless of where the milk is processed or sold. (Id.) Cooperatives are not required to disclose or

5

pass along these premiums to their farm members. (R. 458-60.) Cloverland obtains the other sixty-five percent (65%) of its raw milk from independent producers. (R. 47.) In total, Cloverland purchases over ninety percent (90%) of its raw milk from Pennsylvania producers. (R. 46.)

In 2002, Cloverland's variable cost to process milk was $ 0.4336 per gallon.[4] (R. 700 and 746.) This amount represents the lowest price at which Cloverland could sell its milk without profit and still cover its costs. Cloverland pays more for raw milk and is less efficient than three of the four Pennsylvania processors put forth by Defendants. (R. 720.) Cloverland is at a price disadvantage as to these in-state rivals in both milk acquisition and processing. Although Cloverland can sell milk at a cost below the minimum wholesale price floor established by the Board, Cloverland does not have an out-of-state price or efficiency comparative advantage.

Moreover, Cloverland has not established that the minimum wholesale price floor effectively forecloses the Pennsylvania dairy market to Cloverland. Cloverland attempted to solicit business from only three retailers in Area 4 before concluding that the Pennsylvania market was unassailable. (R. 104.) Cloverland made no attempt to solicit business from Area 1. (Id.) Most processors sell at or

---

[4] This was a highly contentious issue during trial and both Cloverland and Defendants put forth experts to testify to Cloverland's cost of milk production. Mr. Havemeyer, a management consultant testifying on behalf of Cloverland, testified that this cost was $0.3677 per gallon. (R. 205 and 242.) Mr. Herbein, a CPA testifying on behalf of PAMD, testified that this cost was $0.4336 per gallon. (R. 700 and 746.) The Court finds Mr. Herbein's cost analysis to be more credible. Mr. Havemeyer examined Cloverland for only a thirteen-week period during a seasonal height in the dairy industry, whereas Mr. Herbein conducted a full year review. (R. 268 and 747-48.) Mr. Havemeyer excluded certain costs in contravention of generally accepted accounting principals and also excluded from his study certain aspects of Cloverland's business. (R. 747-50.) Accordingly, the Court finds Mr. Herbein's testimony to be more credible and his figures to be a more accurate representation of Cloverland's production costs.

around the wholesale floor price, precluding appreciable amounts of competition based upon price.

(Plaintiff's Exhibit 30.)  However, there exists competition among processors in quality, service, and the

ability to bundle the delivery of non-milk based drinks.  (R. 179.)  Processors frequently lose and gain

accounts throughout the year, sometimes because of service issues or because retailers desired a

certain unique product.  (R. 179-80, 603, 684-85, 692-95).  Although price is a significant factor in

competing for business within the Pennsylvania dairy market, twice as many retailers choose name

recognition as the number one factor informing their choice of supplier.  (Plaintiff's Exhibit 35.)

Retailers also rely upon service, product selection, loyalty, dependability, quality of product, and shelf

life as important factors in choosing a wholesaler.  (Id.)  Some retail stores prefer the bundled delivery

and sale of tea products with their wholesale milk purchases.  (R. 179.)   Some retailers select

wholesalers entirely on whether the firm is willing to deliver to a remote retail location.  (Id.)  Moreover,

the taste of the final product varies enough between labels to create consumer demand for certain

brands.  Accordingly, the Court finds that competition for businesses exists in Areas 1 and 4 based

upon a number of factors unrelated to the price of milk.  As noted, Cloverland has established that it

can compete with Pennsylvania dealers only by selling milk at prices below the wholesale milk floor.

Because the Court finds that competition for milk contracts concerns many factors unrelated to price,

the Court finds that even were Cloverland able to establish that it could sell milk for the lowest price,

Cloverland would not enjoy a competitive advantage that would enable it to penetrate the Pennsylvania

dairy market.  Thus, the Court finds that the minimum price floor does not have the practical effect of

preventing Cloverland from entering the Pennsylvania milk market.

     The Court finds the following facts with respect to the local benefit of the Milk Law.  Seventy-

five percent (75%) of the country's milk is produced in only three areas, the northeast, the upper midwest, and California. (R. 425; Defendants' Exhibit 81.) Within the northeast, half of the region's milk is produced by New York and Pennsylvania. (R. 425.) In 2002, Pennsylvania produced 10.8 billion pounds of milk. (R. 430-34.) Although Pennsylvania consumers drink only 2.5 billion pounds of milk, the Commonwealth supplies Class 1 milk for Connecticut, New York, New Jersey, Maryland, and South Carolina. (R. 426-27.) The federal order price, standing alone, has not adequately guaranteed enough income to protect Pennsylvania dairy farms since 1988. (R. 455-456, 903.) Without the Milk Law and the over-order premiums it provides over and above the federal order system, the small independent dairy farms that make up the Pennsylvania dairy industry would not survive.[5] (R. 462, 484.) Because of their size, these small dairy farms are especially vulnerable to economic pressures. (R. 462, 484.) Pennsylvania farms must also operate on the fringe of the urban landscape that makes up the Northeast, resulting in higher land prices than farms face in the Midwest. (R. 462, 485.) The Milk Law allows these small farms to survive without forming cooperatives, fostering diversity in the market. (R. 457-58.)

Under the Milk Law pricing scheme, Pennsylvania farmers receive a larger share of the retail price than do farmers in deregulated states and retail prices are lower for Pennsylvania consumers. (R. 931-322, 944-47.) Without the minimum wholesale floor, smaller processors would be driven out of

---

[5] Pennsylvania has 10,000 dairy farms, of which the average cow herd is 58-59 cows per farm. (R. 462.) The national average is 100 cows per farm and Idaho, another large milk producing state, averages 1000 cows per farm. (R. 462.)

business by a small number of oligopsonistic and oligopolistic processors.[6] (R. 948-66.) These firms would attempt to force the price of raw milk down while simultaneously placing an upward pressure on the price paid by the consumer. (R. 964-966.) Consumer prices would fall in the short term, but rise heavily in the long term as competition in the marketplace consolidated into a few large powerful firms (R. 948-66.)

Agriculture is the leading segment of Pennsylvania's economy and dairy makes up half of all agricultural sales, approximately $1.8 billion annually. (R. 905-06.) Accordingly, if the number of Pennsylvania dairy farms begins to decrease, the agricultural infrastructure built around the industry will also be negatively affected, resulting in loss of dealers, feed stores, veterinarians, and other business that support the dairy industry. (Id.) Weakening the infrastructure would eliminate still other farms, initiating a cycle of decay eventually damaging portions of the Commonwealth's general economy. (Id.) In addition, with fewer milk farms in the state, the production of milk will decline. (R. 905.) Dairy farmers benefit from the Commonwealth's minimum price floors because minimum wholesale prices allow processors to pay the producers for their milk in a timely manner. (R. 904-05.) Without the Milk Law pricing structure, the Court finds that the number of dairy farms in Pennsylvania would decrease. (R. 905.)

## II.    Discussion and Conclusions of Law

### A.    DORMANT COMMERCE CLAUSE

---

[6] Oligopsony is the "[c]ontrol or domination of a market by a few large buyers or consumers." BLACK'S LAW DICTIONARY 1120 (8th ed. 2004.) Oligopoly is the "[c]ontrol or domination of a market by a few large sellers, creating high prices and low output similar to those found in a monopoly." Id.

Pursuant to the Third Circuit's Order remanding this matter, this Court is called upon to consider Cloverland's Dormant Commerce Clause challenge to orders A-890A and A-900. The negative, or dormant, aspect of the Commerce Clause prohibits state regulations that discriminate against or unduly burden interstate commerce, thereby "imped[ing] free private trade in the national marketplace." Reeves, Inc. v. Stake, 447 U.S. 429, 437 (1980).

The Supreme Court has distinguished between state regulations that affirmatively discriminate against interstate commerce and those regulations that only incidentally burden interstate transactions. Maine v. Taylor, 477 U.S. 131, 138 (1986). Regulations in the first group discriminate against interstate trade "either on its face or in practical effect" and are subjected to heightened scrutiny. Maine, 477 U.S. at 138. On the other hand, regulations in the second group are prohibited only if the burdens they impose on interstate commerce are "clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142 (1970).

"[S]tate laws that are facially neutral but have the effect of eliminating a competitive advantage possessed by out-of-state firms trigger heightened scrutiny." Cloverland, 298 F.3d at 211. "[I]f a state regulation has the effect of protecting in-state businesses by eliminating a competitive advantage possessed by their out-of-state counterparts, heightened scrutiny applies." Id. at 212 (citing Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511 (1935) and Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333 (1977)).

In evaluating this Court's entry of summary judgment for Defendants, Third Circuit explained that:

a reasonable trier of fact could conclude that, by eliminating out-of-state

10

dealers' competitive advantage, the Commonwealth's minimum wholesale prices "'cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market.'"

Id. at 214 (quoting W. Lynn Creamery v. Healy, 512 U.S. 186, 196 (1994)(quoting Exxon Corp. v. Governor of Md., 437 U.S. 117, 126 n.16 (1978))). Thus, Cloverland was entitled to demonstrate through evidence presented at trial that the Board's minimum wholesale prices prevent it and/or others from competing in Pennsylvania's wholesale milk market. Upon such a showing, Pennsylvania's minimum price scheme would be evaluated for a dormant commerce clause violation applying heightened scrutiny. Id. Moreover, the Third Circuit clearly pronounced that if the regulations at issue are subjected "to heightened scrutiny, the wholesale price floors cannot satisfy the dormant Commerce Clause" and must be invalidated as unconstitutional barriers to interstate trade. Id. at 215.

Alternatively, if the Court finds that the statutes at issue regulate evenhandedly, but nevertheless "incidentally burden interstate commerce by making it more difficult for out-of-state dealers to attract new business in a market dominated by in-state dealers," then the Court must examine the regulations' constitutionality under the Pike balancing test. Cloverland, 298 F.3d at 215. Under Pike, state regulations which serve a legitimate local interest and do not patently discriminate against out-of-state firms, "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142. In considering the local interests, the Supreme Court instructs that;

> [where] such legitimate local interest are implicated, defining the appropriate scope for state regulation is often a matter of delicate adjustment. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as

well with a lesser impact on interstate activities.  The principal focus of inquiry
must be the practical operation of the statute, since the validity of state laws
must be judged chiefly in terms of their probable effects.

Lexis v. BT Inv. Managers, 447 U.S. 27, 36 (1980) (internal citations and quotation marks omitted).

"[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest

involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

Pike, 397 U.S. at 142.  For example, in Minnesota v. Clover Leaf Creamery Co., the Supreme Court

upheld a Minnesota statute banning the retail sale of milk in plastic jugs, because the statute imposed

burdens on both in-state and out-of-state dairies and promoted the substantial state interests of

conservation and waste reduction.  449 U.S. 456 (1981).

## B.    HEIGHTENED SCRUTINY

The Milk Laws at issue in the case at bar are not facially discriminatory because they apply

equally to in-state and out-of-state businesses alike.  Therefore, in determining whether the wholesale

price floor should be examined under heightened scrutiny, the Court must determine whether the

regulation's practical effect is to foreclose Pennsylvania's milk market to out-of-state processors by

eliminating a competitive advantage enjoyed by such processors.  Cloverland, 298 F.3d at 212.

"[S]tate laws that are facially neutral but have the effect of eliminating a competitive advantage

possessed by out-of-state firms trigger heightened scrutiny."  Id. at 211.  A state statute is presumed

valid under the United States Constitution until such time that a challenger to the law "shoulder[s] the

burden of overcoming that presumption."  Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644,

662 (2003).  Cloverland has the burden to prove that it possesses a competitive advantage over

Pennsylvania milk dealers and that this advantage would translate into Pennsylvania business but for the

12

equalizing effect of the wholesale price floor.

If Cloverland demonstrates that it possesses a distinct competitive advantage that is foreclosed by the Milk Laws, the burden shifts to the Commonwealth to prove that it has "no other means to advance a legitimate local interest." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 392 (1994).[7] According to Defendants, the primary purpose of the Milk Law is to ensure an adequate supply of quality milk and to prevent predatory pricing. (Docs. No. 242 at 42 and 198, Ex 2, ¶ 14-16.) According to the United States Court of Appeals for the Third Circuit, these interests allegedly can be achieved using alternative means exempt from Dormant Commerce Clause scrutiny, such as utilizing the market participant exception. Cloverland, 298 F.3d at 215. Therefore, the instant minimum wholesale price floor is not part of the narrow class of cases referred to in C & A Carbone and cannot survive a heightened scrutiny analysis. (Id.)

In examining whether Cloverland meets its burden, the Court must first determine whether Cloverland has a competitive advantage "'belonging to the place of origin'" over its in-state competitors. Cloverland, 298 F.3d at 214 (quoting Baldwin, 294 U.S. at 527). Determining what constitutes "competitive advantage" is decidedly complex, especially when attempting to apply the legal construct to the complex realities of contemporary commerce.[8] In articulating the heightened scrutiny

---

[7] "Discrimination against interstate commerce in favor of local business or investment is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." C & A Carbone, Inc., 511 U.S. at 392 (citing Maine v. Taylor, 477 U.S. 131 (1986) (which upheld Maine's ban on the importation of baitfish because Maine had no other means to prevent the spread of parasites and the adulteration of its native fish species)).

[8] "[O]nce one gets beyond the facial discrimination our negative-Commerce-Clause jurisprudence becomes (and long has been) a quagmire." West Lynn Creamery, 512 U.S. at 210

analysis upon which the Court now relies, the Third Circuit referenced certain factual scenarios, that if

proven, would warrant a heightened scrutiny analysis.  For instance, the Third Circuit held that:

> [o]ne conclusion that a reasonable trier of fact could reach is that out-of-state
> dealers have a competitive advantage over their in-state counterparts.  Higher
> raw milk costs necessitate higher wholesale prices. Because dealers buy milk
> from local dairy farmers, dealers from a state that imposes "over-order" prices
> are at a disadvantage when exposed to competition from dealers whose home
> states do not prop up milk producers' prices above the federal floors.  Unlike
> neighboring states such as Maryland, where Cloverland is based, Pennsylvania
> forces its dealers to pay "over-order" prices for raw milk.  A reasonable trier of
> fact could find that out-of-state dealers' ability to acquire raw milk at lower
> costs gives them a competitive edge over Pennsylvania dealers.

Cloverland, 298 F.3d at 213.  Even with this legal roadmap in hand, the trial record does not support

any of the alternative theories for applying heightened scrutiny advanced by the Third Circuit.

Cloverland did not demonstrate that it enjoys a competitive edge that the Board's minimum prices

eliminate.  Contrary to the limited record available to the Third Circuit, Cloverland does not purchase

its milk from local Maryland dairy farmers, but rather purchases the vast majority of its raw milk from

Pennsylvania farmers.  Cloverland offered no testimony to explain why it purchases its raw milk from

Pennsylvania producers rather than local Maryland producers.[9]  However, the fact that Cloverland

_____

(SCALIA, J., concurring)(internal quotation omitted.)

[9] Because of Cloverland's heavy dependance upon Pennsylvania raw milk, there was no
evidence regarding the price of local Maryland raw milk.  As suggested by the Third Circuit, the natural
inclination is that "dealers buy milk from local dairy farmers . . . ."  Cloverland, 298 F.3d at 213.  The
fact that Cloverland buys nearly all of its milk from Pennsylvania suggests that Maryland milk may in
fact be more expensive than Pennsylvania raw milk prices, even when the over-order premium is
added.  Perhaps without over-order premiums, Maryland independent dairy farmers were forced to
join cooperatives, which according to the evidence at trial, charge higher prices.  Perhaps without a
price structure, Maryland's dairy infrastructure is unable to produce enough raw milk to supply the 28
million pounds of milk Cloverland requires each month.  (R. 46.)  As there was no evidence presented
at trial on why Cloverland purchases its milk from Pennsylvania, and not locally, the Court makes no

depends on acquiring raw Milk from Pennsylvania presents a situation distinct from that at issue in

Baldwin, 294 U.S. at 522, and Washington State Apple, 432 U.S. at 349-54. In both of those cases,

the firms that challenged state regulation enjoyed a competitive advantage that derives from some

aspect unique to the out-of-state economy as compared to the economy of the regulating state. In

Baldwin, the New York regulation prohibited a Vermont firm from enjoying the availability of local

Vermont raw milk and importing it to New York. 294 U.S. at 518-20. In Washington State Apple, a

North Carolina law prohibited Washington state apple firms from using Washington's superior rating

system in North Carolina. 432 U.S. at 336-41. Cloverland is not similarly disadvantaged. Unlike the

New York and Vermont plaintiffs, Cloverland is not forced to forfeit a superior position gained in

Maryland in order to conduct business in Pennsylvania. Indeed, Cloverland has produced no evidence

of any such advantage.[10]

     Rather, any raw milk price advantage enjoyed by Cloverland arises from the very Milk Law

pricing structure it seeks to partially invalidate. The evidence at trial demonstrated that the over-order

premiums allow small independent Pennsylvania dairy farms to survive without forming cooperatives,

------------------------------------------------

findings as to the Maryland price of raw milk. Regardless, Cloverland has not demonstrated that it
enjoys or utilizes a competitive advantage of being able to acquire cheap Maryland milk, or that such
cheap Maryland milk even exists.

    [10] The trial revealed that Maryland processors suffer a federal Class 1 differential disadvantage,
as compared to Pennsylvania firms, because of their geographic location. (R. 438-439, 735.) The
Federal Order system favors the movement of raw milk east and south throughout the northeastern
United States. (Id.) Accordingly, a firm in Baltimore, Maryland pays a higher Federal minimum Class
1 differential for local raw milk than a similarly situated Pennsylvania processor in Area 4 would have to
pay for local raw milk, merely because the Pennsylvania firm is located relatively farther northwest.
(Id.) In fact, Cloverland's cost for raw milk was higher than the Pennsylvania dealers put forth by
Defendants. (R. 731-40.)

which charge higher market prices for the raw milk. (R. 382-83, 457-60, 540-41.)  Most Pennsylvania processors must pay these local farmers the market price for their raw milk plus an over-order premium.  However, because the Milk Law does not require firms which process milk out-of-state to pay the over-order premiums, Cloverland can lawfully circumvent the pricing architecture and purchase cheap Pennsylvania milk from independent dairy farmers without paying the over-order premiums that allow the small farms to survive and continue selling cheaper independently produced milk.  Cloverland now seeks to invalidate the minium wholesale price floor section of the Milk Law, while keeping intact the law's over-order premium requirement, in order to reimport the milk back into the Pennsylvania market.

At most, this advantage is ephemeral, as the same law that requires minimum wholesale and retail price floors also provides for the over-order premiums that enables Cloverland to buy non-cooperative cheap milk in Pennsylvania.  The evidence at trial indicates that if the wholesale price floor falls, so too will the over-order premium substructure.  (R. 382.)  Although Cloverland greatly derides Defendants' "three-legged stool" analogy regarding the interrelation of the Milk Law's sub-parts, Defendants persuasively demonstrate that the small dairy farms, from which Cloverland derives most of its milk, can only survive in a system with wholesale and retail price floors.  (Id.)  These minimum price floors allow processors to pay timely into the pool paid to the small dairy farmers.  Without this leg, Cloverland will lose the over-order premium leg upon which it depends for ninety-percent of its raw milk.

Notwithstanding the above, courts have struggled with a more fundamental constitutional issue involved here, one that goes to the heart of the difficulty in examining laws which do not facially

16

discriminate against out-of-state interests under Dormant Commerce Clause jurisprudence. When does a simple economic advantage rise to the level of competitive advantage, within the heightened scrutiny context?[11] The Court does not interpret <u>Cloverland</u> to mean that an out-of-state firm need only prove that it can sell below a regulatory established price floor in order to invalidate the price floor. Such a rule would render the <u>Pike</u> balancing test a nullity and broaden the rule far beyond the province of preserving healthy interstate commerce.[12] Rather, the central theme throughout negative Commerce Clause cases is one of discrimination against non-resident firms. <u>See</u> <u>Pike</u>, 397 U.S. 137 (invalidating a Arizona law that required all Arizona-grown cantaloupes to be packaged within the state prior to export); <u>Polar Ice Cream & Creamery Co. v. Andrews</u>, 375 U.S. 361 (1964) (invalidating a Florida law which prohibited out-of-state milk from entering the Florida milk market unless local production was inadequate).

---

[11] The Court notes that Cloverland, a Maryland firm, bought most of its milk from Pennsylvania and one of the Pennsylvania firms proffered by Defendants, bought much of its raw milk from a Maryland affiliate. (R. 46, 734.) Based upon the evidence presented at trial, the free-flow of milk between states appears rather healthy.

[12] If every state law that negatively affects an out-of-state firm, as compared to an in-state firm, was subjected to heightened scrutiny, there would never be a need for the <u>Pike</u> balancing test, as few laws would ever pass the stricter analysis. Suppose a town closes a residential road, causing a single out-of-state firm additional transportation expenses vis-s-vis an in-state firm on the opposite side of the town. Surely heightened scrutiny would not apply in reviewing the constitutionality of the closure, merely because an out-of-state firm is negatively affected to the serendipitous benefit of an in-state firm. If such were the case, all state and local laws would fall suspect. For the <u>Pike</u> balancing test to have any meaning, not all disadvantages created by statute must rise to the level of foreclosing a competitive advantage. Rather, the analyses of pertinent Supreme Court cases suggest that heightened scrutiny is more appropriate in those unique instances when the challenged regulation is either discriminatory on its face or when it discriminates against out-of-state interests on the whole, by eliminating advantages that they commonly share. <u>Washington State Apple</u>, 432 U.S. 333; <u>Pike</u>, 397 U.S. 137; <u>Baldwin</u>, 294 U.S. 511.

Thus, the analysis focuses upon advantages with some basis in the firm's place of origin; advantages that would appear applicable over all competing firms.[13]  The evidence at trial demonstrated that Cloverland does not possess an inherent out-of-state advantage.  Rather, Cloverland's costs are lower than they otherwise might be because Cloverland circumvents the Milk Law scheme.  However, this advantage exists only because the wholesale price floor and Milk Law pricing structure exist and Cloverland is an out-of-state firm.  More to the point, unlike the previous Dormant Commerce Clause cases, if Cloverland moved its operations to Pennsylvania it would lose this advantage and be in a worse position under the Milk Laws.  See Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 670 (2003) (distinguishing the case from that of West Lynn because "[a] manufacturer could not avoid its rebate obligation by opening production facilities in Maine and would receive no benefit from the rebates even if it did so; the payments to the local pharmacists provide no special benefit to competitors of rebate-paying manufacturers."); Dean Milk Co. v. Madison, 340 U.S. 349 (1951) (finding invalid a city ordinance which requiring all milk sold in the city to be pasteurized within five miles of the city of Madison, thus promoting local firms over distant in-state and out-of-state firms).[14]

---

[13] Thus, if Cloverland's competitive price advantage arose from Maryland firms' ability to buy cheap local milk, the wholesale price floor would fall under a heightened scrutiny analysis.  However, this is not the case at bar.

[14] In West Lynn Creamery, Inc. v. Healy, 512 U.S. 186 (1994), the Supreme Court invalidated a Massachusetts regulation that imposed an assessment on all fluid milk sold by processors to Massachusetts retailers, distributing the proceeds to Massachusetts dairy farmers.  The Court found that, because two-thirds of the assessed milk was produced by out-of-state farmers while the entire fund was used to benefit in-state farmers, the order effectively imposed a tax on out-of-state producers to subsidize production by their in-state competitors.  Thus, the Supreme Court concluded that the program was invalid because it had a discriminatory effect analogous to a protective tariff that taxes goods imported from neighboring states but does not tax similar products produced locally.  Here, the reverse is true.  Ninety percent of the milk subject to the wholesale price floor is from Pennsylvania

Similarly, Cloverland's efficiencies in processing the milk are not based upon Cloverland's out-of-state status. Despite the voluminous testimony on this point, the evidence at trial merely reveals that Cloverland is more efficient in processing its milk than some Pennsylvania firms and is less efficient than others. (R. 719-66; Defendants Exhibits 6,16.) Cloverland has established no connection between efficiency and Maryland residency. Half of the Pennsylvania firms put forth by Defendant can process milk more efficiently than Cloverland, with the remainder processing only slightly less efficiently. Although the Third Circuit observed that, an "ordinance is no less discriminatory because in-state or in-town processors are also covered. . . . Similarly, if the wholesale price floors protect incumbent in-state dealers not only from out-of-state competitors, but also from in-state ones . . . that simply exacerbates their protectionist effect." Carbone, 511 U.S. at 309-91. However, the Court does not read this to mean that Cloverland has a "competitive advantage", merely because it can process milk more efficiently than a single in-state firm. This would render all state business regulations suspect. Rather, competitive advantage would appear to require something inherently unique to a firm or domicile that would translate into interstate business absent the challenged regulation. See e.g. C&A Carbone, 511 U.S. at 389 (Clarkstown city law which prohibited New Jersey firm from using less expensive New Jersey waste facilities); Washington Apple, 432 U.S. at 351 (North Carolina law which prohibited use of the superior Washington grade system by Washington firms); Baldwin, 294 U.S. at 520 (New York law which prohibited Vermont firm from selling Vermont raw milk at Vermont prices).

---

farms, which the price floor seeks to protect.

Cloverland offered no credible evidence that it could in fact compete in the Pennsylvania marketplace, absent of the Milk law. Cloverland offered no expert testimony regarding its ability to compete, beyond testimony by its own personnel that Cloverland would need to offer cheaper milk to solicit business successfully. (R. 52.) Nor did Cloverland provide testimony from the three Pennsylvania businesses it unsuccessfully solicited as to the importance of price in making their determination. Examining the evidence presented at trial, the Court is not convinced that the actual effect of the minimum price floor is to foreclose the Pennsylvania market to Cloverland. In fact, the Court finds convincing evidence that there exists a rich competition among processors in quality, service, and the ability to bundle the delivery of non-milk based drinks. (R. 179.) Credible evidence at trial demonstrated that processors would frequently lose and gain accounts throughout the year, sometimes because of service issues or because retailers desired a certain unique product. (R. 179-80, 603, 684-85, 692-95.) One Pennsylvania processor testified that the bundled sale of non-milk tea products was often a "big influence on customers and their buying patters." (R. 179.)

At trial, Cloverland testified that it solicited business from three retailers in Area 4 before concluding that the Pennsylvania market was unassailable. (R. 104.) Cloverland put forth no evidence that it attempted to solicit any business from Area 1. There is simply not enough evidence to find that the minimum price floor eliminates an out-of-state advantage enjoyed by Cloverland. Neither does the Court have before it any credible evidence that the minimum price floor has the practical effect of preventing Cloverland from entering the Pennsylvania milk market. Accordingly, the Court does not find that the wholesale price floor causes "'local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market.'" West Lynn

20

Creamery, 512 U.S. at 196 (quoting Exxon Corp. v. Governor of Md., 437 U.S. 117, 126 n.16

(1978)).  Therefore, the Court finds that the heightened scrutiny analysis articulated in Cloverland, 298

F.3d 201, does not apply under the facts of this case.

###  C.    PIKE BALANCING TEST

The Court next examines the Milk Law under the less stringent Pike analysis, established in

Pike v. Bruce Church, 397 U.S. at 142.  The Pike balancing test is applied if the challenged state

regulation "regulate[s] evenhandedly, but incidently burden[s] interstate commerce by making it more

difficult for out-of-state dealers to attract new business in a market dominated by in-state dealers."

Cloverland, 298 F.3d at 215.  The regulation violates the Dormant Commerce Clause if the burden the

law imposes on interstate commerce "clearly outweighs" its local benefits.  Pike, 397 U.S. at 142.

"Where the statute addresses a legitimate local public interest, and its effects on interstate

commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly

excessive in relation to the putative local benefits."  Pike, 397 U.S. at 142.  Under the Pike balancing

test, the Court must balance the state's interest in the regulation against the burden on interstate

commerce resulting therefrom, not merely balance one state's interests against another.  Instructional

Sys. v. Computer Curriculum Corp., 35 F.3d 813, 826 (3d Cir. 1994).  "[T]he fact that a law may

have 'devastating economic consequences' on a particular interstate firm is not sufficient to rise to a

Commerce Clause burden."  Instructional Sys., 35 F.3d at 827 (quoting Ford Motor Co. v. Insurance

Comm'r, 874 F.2d 926, 943 (3d Cir. 1989)).  The proper focus should be on the manner in which the

statute regulates and "the fact that the statute regulated indiscriminately compels the conclusion that the

Commerce Clause [has] not been violated."  Ford Motor Co., 874 F.2d at 944.

The Supreme Court has upheld "a State's power to require that produce packaged in the State be packaged in a particular kind of receptacle," <u>Pacific States Box & Basket Co. v. White</u>, 296 U.S. 176 (1935) and has "recognized the legitimate interest of a State in maximizing the financial return to an industry within it," <u>Parker v. Brown</u>, 317 U.S. 341 (1943). <u>Pike</u>, 397 U.S. at 143.

Although the Court finds convincing evidence that Areas 1 and 4 are dominated by in-state processors, the Court is unpersuaded that this market arrangement occurs because the minimum wholesale price floor forecloses the market to out-of-state firms. Milk is a perishable product and retailers appear particularly concerned with a supplier's ability to respond quickly to changes in demand and weather. (Plaintiff's Exhibit 35.) Moreover, since dairy is the largest component of Pennsylvania's largest industry (agriculture), it is not surprising that Pennsylvania would produce a large number of strong local processing firms. (R. 385 and 905.) Considering these factors, it is logical that geographically local firms tend to be preferred over out-of-state firms independent of regulatory pressures. However, even assuming arguendo that the wholesale minimum price floor does exert some negative pressure onto interstate commerce, this burden does not "clearly outweigh" the law's putative local benefits. <u>Pike</u>, 397 U.S. at 142.

Although the issue before the Court is the Board's ability to set minimum wholesale prices, the evidence at trial and the language of the statute itself demonstrates that the Board's minimum wholesale prices represent an essential component of the Milk Law pricing scheme, working in connection with the over-order premium and the retail price floor. 31 P<small>A</small>. C<small>ONS</small>. S<small>TAT</small>. A<small>NN</small>. § 700j-101 <u>et</u> <u>seq</u>. The evidence at trial established that the minimum wholesale price floor enables processors to pay promptly over-order premiums to the dairy farmers and without the price floor, processors would be unable or

unwilling to continue paying state over-order premiums to Pennsylvania dairy farmers.  (R. 377, 905-06.)  Credible evidence was also presented which indicated that the wholesale price floor promoted a large and diverse market of milk processors, which in turn helped small independent dairy farms that would otherwise be unable to sell to large processors or join cooperatives.  (R. 382-83, 540-41.)  The bulk of evidence concerning local benefit, focused upon the health of small independent dairy farmers, rather than processors themselves.  As the Court finds that the minimum wholesale price structure serves primarily to support dairy producers within the larger Milk Law pricing scheme, the Court must weigh the interstate commerce burdens against the putative local benefits of the Milk Law as a whole.

In establishing the purported benefits of the Milk Law, the Court turns to the language of the law itself.  The law was enacted "for the purpose of regulating and controlling the milk industry in this Commonwealth, for the protection of the public health and welfare and for the prevention of fraud."  31 PA. CONS. STAT. ANN. § 700j-101.  Accordingly, the Board was given the power to:

> ascertain, after a hearing in which all interested persons shall be given reasonable opportunity to be heard, . . . such prices paid to producers, to dealers and to stores for milk in the respective milk marketing areas as will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein.

31 PA. CONS. STAT. ANN. § 700j-801.

In arguing for or against the benefits of the Milk Law, the parties offered expert testimony on the current affects of the law on the local market and what would occur if the law was removed.  Not surprisingly, the experts had diametrically opposing viewpoints on the issue.      Plaintiff proffered Dr. Harris, an expert in agricultural economics.  (R. 109-10, 114.)  Dr. Harris testified, inter

alia, that the wholesale minimum price floor is not reasonably related to ensuring an adequate supply of milk.  (R. 116.)  Dr. Harris further testified that minimum wholesale floors cause higher prices, excess supply, and only benefit the in-state processors to the detriment of consumers and out-of-state competitors.  (R. 179-20; Plaintiff's Exhibit 34, ¶ 21.)  Moreover, Dr. Harris alleged that "[d]airy farmers are not aided at all by retail price regulation."  (Plaintiff's Exhibit 34, ¶ 23.)

In rebuttal, Defendants proffered two experts: Dr. Bailey, an expert in agricultural and dairy economics from Penn State University (R. 397-99) and Dr. Gruebele, an expert in dairy economics and marketing (R. 925-29).  Collectively, the two men testified that three-quarters of the United State's milk is produced in the northeast, the upper midwest, and California and within the northeast, half of the region's milk is produced by New York and Pennsylvania.  (R. 425; Defendants' Exhibit 81.)  Although Pennsylvania produces four times the amount of milk it consumes, the state supplies milk to Connecticut, New York, New Jersey, Maryland, and South Carolina.  (R. 426-27, 430-34.)  Due to this unique status as a major milk supplying state, Pennsylvania requires a pricing scheme to maintain the in-state supply.  (R. 450-53.)  The over-order premiums provided by the Pennsylvania and federal systems are necessary to the survival of  independent Pennsylvania dairy farms.  (R. 462, 484.)[15] Because Pennsylvania farms operate on the fringe of the northeastern urban landscape, where demand for land results in higher land prices and pressure to develop fields, Pennsylvania dairy farms require the federal and state over-order premiums to survive (without forming cooperatives), fostering diversity in

---

[15] Concerns regarding whether the Commonwealth or the United States Government should subsidize the milk industry is a political question beyond the purview of this Court.

the marketplace.[16]  (R. 457-58.)  Cooperatives negotiate over-order premiums with the processors

they supply, but are not required to disclose nor pass along these premiums to their farm members.  (R.

458-60.)  Moreover, under the Milk Law pricing scheme, Pennsylvania farmers receive a larger share

of the retail price than farms in deregulated states.  (R. 932, 944-45.)

Further, Dr. Gruebele testified that without the Milk Law pricing system, consumer prices

would fall in the short term, but rise heavily in the long term.  (R. 948-61.)  In 1976, Dr. Gruebele

performed a study on the California milk industry.  (1949-50.)  During this time, California still had a

minimum wholesale and retail pricing scheme in place.  (Id.)  Dr. Gruebele found that Los Angeles had

the lowest retail price of milk among the American cities studied and was comparable to Pennsylvania.

(R. 49; Defendant's Exhibit 21.)  Dr. Gruebele also found that the farms were getting a high portion of

the retail price.  (Id.)  Dr. Gruebele attributed to these findings the minimum price floors.  (Id.)  By

1992, two years after the minimum price floors were suspended, Los Angeles had one of the highest

retail prices for milk in the study and one of the worst price margins for farmers.  (R. 952-53, Plaintiff's

Exhibit 22.)  According to Dr. Gruebele, after suspending the minimum price structure, California

consumers saw a brief drop in prices followed by a constant increase in retail price as the market

became oligopsonistic.  (R. 952, 961-963.)  Dr. Gruebele further testified that retail prices are lower

and farms receive a higher percent of the retail price under Pennsylvania's Milk Laws then they would

without the price structure.  (R. 931, 947.)

Defendants also offered the testimony of Mr. Rotz, a director with the Pennsylvania Farm

_____

[16] Pennsylvania's cooperative participation is lower that any other high milk processing state.
(R. 457-58.)

25

Bureau, a trade association for Pennsylvania dairy farmers.  (R. 901-02.)  Mr. Rotz testified, inter alia, that the Pennsylvania Farm Bureau supports the Milk Law pricing mechanism because over-order premiums are necessary for the survival of its smaller member farms.[17]  (R. 903.)  According to Mr. Rotz, the federal order price has not adequately protected Pennsylvania dairy farms since 1988.  (Id.) Without the over-order premiums, the number of dairy farms in Pennsylvania will decrease.  (R. 905.) Mr. Rotz also testified that agriculture is the leading segment of Pennsylvania's economy and dairy sales make up half of all agricultural sales.  (R. 905-06.)  Accordingly, if the number of Pennsylvania dairy farms begins to decrease, the agricultural infrastructure built around the industry will also be negatively affected, resulting in loss of dealers, feed stores, veterinarians, and other business that support the dairy industry.  (Id.)  According to Mr. Rotz, weakening the infrastructure would squeeze still other farms, initiating a cycle of decay eventually hurting portions of the Commonwealth's general economy.  (Id.) In addition, with fewer milk farms in the state, the production of milk will decline.  (R. 905.)

Mr. Rotz also testified that the farmers also benefit from the minimum price floors as well.  (R. 904-05.)  According to Mr. Rotz, minimum wholesale prices allow "processors to recover their cost and gives them the ability to, in a timely manner, pay the producers for their milk."  (R. 904.)  As Mr. Rotz explained, the minimum price floors "establish a solid basis for paying producers in a timely manner, and in addition to that if we don't have the minimum prices, we are likely not going to have the over-order premium, and without the over-order premium we will have less dairy farmers in the state." (R. 905.)

_____

[17] Specifically, Mr Rotz testified that his organization supports "both the minimum retail and wholesale prices, as well as minimum producer prices."  (R. 905.)

Based upon the extensive testimony and exhibits presented at trial, and the record as a whole, the Court finds more credible and persuasive the testimony of Drs. Bailey and Gruebele.  Dr. Bailey and Dr. Gruebele presented a more reliable and detailed analysis of the milk industry and largely undisputed evidence concerning Pennsylvania's small dairy farms.  Additionally, although the Court recognizes that members of Mr. Rotz's trade association directly benefit from the over-order premiums provided by the Milk Law, the Court finds credible Mr. Rotz's testimony on the necessity of the Milk Law to Pennsylvania dairy farmers, the state dairy industry, and the state economy in general. Accordingly, the Court finds that the over-order premiums, minimum wholesale prices, and minimum retail prices promote and protect small dairy farms, prevent an oligopsonistic and/or oligopolistic dairy market, and ensure an abundant quantity of quality milk at relatively lower sustainable consumer prices.

The reliable evidence at trial demonstrated that the Milk Law benefits local independent dairy farms and promotes the stability of price and supply within the Pennsylvania dairy market.  The incidental burden the Milk Law places upon interstate commerce does not clearly outweigh the several local state interests found above.  Accordingly, the Court finds that the wholesale minimum price regulations does not violate the Commerce Clause.  An appropriate Order shall follow.

**III.    Order**

**AND NOW**, therefore, this 30th day of March, 2005, **IT IS HEREBY ORDERED THAT:**

1)    The Clerk of Court shall enter judgment for Defendants and against Plaintiff.

2)    Plaintiff's Motion for Preliminary Injunction (Doc. 158) is **DENIED**.

3)    Defendant's Motion to Amend the Trial Testimony (Doc. 235) is **DENIED**.

4)    Defendants' objections to certain portions of paragraphs 10, 12, and 31 of Plaintiff's Exhibit 34 (R. 154-55) are **SUSTAINED** and those portions of the record are **HEREBY STRICKEN**.

5)    Defendants' objections to Plaintiff's Exhibit 22 (R. 175) are **SUSTAINED** and the exhibit is **HEREBY STRICKEN**.

6)    Defendants' objections to Mr. Rutter's testimony regarding the costs of school deliveries (R. 186) is **OVERRULED**.

7)    Plaintiff's objections to Dr. Bailey's testimony regarding the necessity of Pennsylvania's over-order premium (R. 448-453) is **OVERRULED**.

8)    The Clerk of Court is directed to close the file.

          S/ Yvette Kane
          Yvette Kane
          United States District Judge

Dated:  March 30, 2005